# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0398V
UNPUBLISHED

| | |
|---|---|
| MICHAEL WASHBURN,<br><br>       Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>       Respondent. | Chief Special Master Corcoran<br><br>Filed: February 6, 2023<br><br>Special Processing Unit (SPU);<br>Table Injury; Tetanus diphtheria<br>acellular pertussis (Tdap) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA); Situs;<br>Severity Requirement |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Zoe Wade, U.S. Department of Justice, Washington, DC,* for Respondent.

## RULING ON ENTITLEMENT[1]

On April 7, 2020, Michael Washburn filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus diphtheria acellular pertussis ("Tdap") vaccine he received on August 28, 2017. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons detailed herein, and after consideration of the parties' positions, I find Petitioner likely received the subject Tdap vaccination in his right arm. I also find

---

[1] Although I have not formally designated this Ruling for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner has satisfied the six-month sequelae requirement. Petitioner is thus entitled to compensation under the Vaccine Act.

## I.     Relevant Procedural History

A year after the claim's initiation, Respondent filed his Rule 4(c) Report, arguing that Petitioner had failed to demonstrate receiving a covered vaccination in his *right* arm because the vaccination record indicates the *left* arm. ECF No. 30 at 5. Respondent further argued that Petitioner failed to satisfy the six-month sequelae requirement (or "severity requirement"). *Id.* at 6. To resolve the matter expeditiously, briefs addressing situs and severity were ordered. ECF No. 31.

On September 16, 2021, Petitioner filed his Motion for Ruling on the Record. ECF No. 33. Petitioner asserted that the record on the whole demonstrates he received the August 28, 2017 Tdap vaccine in his *right* arm, thereafter suffering a *right* SIRVA. (By contrast, Petitioner asserted that he had received the non-covered pneumococcal polysaccharide vaccine ("PPSV23 in his *left* arm). *Id.* at 10-12. Petitioner also asserted that he suffered limitations through November 2018, more than a year post-vaccination, thereby satisfying the severity requirement. *Id.* at 12-13.

Respondent in reaction maintained that "Petitioner has not submitted reliable, persuasive evidence establishing that he received a Tdap vaccine in his right arm," rejecting evidence he characterized as hearsay along with Petitioner's affirmations. ECF No. 34 at 1-5. Respondent also submitted that Petitioner's shoulder injury resolved in February 2018, less than six months post-vaccination. *Id.* at 5-6. Respondent therefore concluded that the matter must be dismissed for failure to meet several core Vaccine Act claim requirements. *Id.* at 6. Petitioner did not file a reply.

The matter is ripe for adjudication.

## II.    Findings

At issue is (a) whether Petitioner's Tdap vaccination was administered in his right or left arm, and (b) whether Petitioner suffered from a right shoulder injury for more than six months (assuming a covered vaccine was received in that arm). Section 11(c)(1)(D)(i) (statutory six-month sequelae requirement).

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section

2

11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

However, incomplete or inaccurate medical records may be outweighed by later testimony, if such testimony is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90- 2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). It is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational. *Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

When the severity requirement is in question, Petitioner must show by preponderant evidence that she "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Song v. Sec'y of Dep't of Health & Human Servs.,* 31 Fed. Cl. 61, 65-66 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 2014) (noting that a petitioner must demonstrate the six-month severity requirement by a preponderance of the evidence). A petitioner must offer evidence that leads the "trier of

fact to believe that the existence of a fact is more probable than its nonexistence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Finding that petitioner has met the severity requirement cannot be based on petitioner's word alone, though a special master need not base their finding on medical records alone. *See* § 13(a)(1); *see Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534, 541 (2021).

### B. Analysis

After a review of the entire record, including Respondent's Rule 4(c) Report and the parties' briefs, I find that Petitioner most likely received the Tdap vaccine in his right arm.[3] Further, I find that Petitioner has met the severity requirement. Specifically, I note the following:

- On August 28, 2017, Petitioner received a Tdap vaccine at his primary care clinic. The administrator, Nurse Rowena Marlow, indicated that the Tdap was given in Petitioner's "left deltoid" at 10:20am. Ex. 1 at 1. Petitioner also received a pneumococcal polysaccharide vaccine ("PPSV23") at the same appointment. Nurse Marlow indicated that the PPSV23 vaccine was also given in Petitioner's "left deltoid" at 10:22am. *Id.* These records were entered and/or edited by Nurse Marlow at 11:28am on August 28, 2017. *Id.*

- On August 31, 2017 (just three days after vaccination), Petitioner returned to his primary care clinic and reported significant *right* arm pain to Nurse Marlow and Dr. Amelia Wantland. Ex. 16 at 36. Petitioner now reported receiving a Tdap vaccination in his *right* arm, and a PPSV23 vaccination in his left arm on August 28, 2017; he woke up with significant *right* arm pain the next morning. *Id.* Petitioner reported inability to lift his right arm overhead, pick up his toddler, or comfortably use his computer mouse. *Id.* Petitioner also reported that his *left* arm was slightly sore the day after vaccination, but to a much lesser degree. *Id.*

- Upon examination, Dr. Wantland found limited active range of motion ("ROM") in Petitioner's right shoulder – 90 degrees of flexion and 100 degrees of abduction. Ex. 16 at 37. Tenderness to palpation along the right deltoid and biceps muscles was also noted. *Id.* Dr. Wantland assessed Petitioner with myositis of the right shoulder and a vaccine reaction, suspecting "localized inflammation…high immunogenicity of Tdap vaccine."

---

[3] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

*Id.* Petitioner was advised to take Aleve, rest and ice his shoulder, and to return if his pain failed to improve. *Id.*

- On September 13, 2017, about two weeks after vaccination, Petitioner called Dr. Wantland regarding his right arm. Dr. Wantland ordered x-ray imaging for Petitioner's right humerus given his "adverse reaction to Tdap injection." Ex. 16 at 44, 53. Petitioner was also referred to physical therapy. *Id.*

- On September 18, 2017, about three weeks after vaccination, Petitioner returned to Dr. Wantland for follow-up on his persistent right arm pain. Ex. 16 at 46, 53. Petitioner reported that the muscle pain had resolved but now the pain was in his shoulder joint. He noted joint clicking and instability. *Id.* at 53. Petitioner also reported that his massage therapist noticed some muscle atrophy of his right shoulder. *Id.* Dr. Wantland documented right shoulder arthralgias, right arm weakness, positive Neers and Scarf signs, and limited flexion and abduction. *Id.* at 53-54. Petitioner was diagnosed with right shoulder bursitis, right shoulder impingement, and right rotator cuff tendinitis. *Id.* at 46, 55. Petitioner was advised to complete his x-ray imaging and begin his physical therapy. *Id.* at 55. Petitioner was also provided with home exercises for his conditions. *See id.* at 55-77.

- Petitioner presented for physical therapy evaluation on September 19, 2017. Ex. 2 at 48. Petitioner reported onset of "right shoulder pain and mobility limitation following TDAP injection ~ 3 weeks ago." Ex. 2 at 49. He reported pain while lifting a coffee pot, a gallon of milk, and his two-year-old son, as well as pain while using a computer mouse, driving, and playing disc. He "had to modify" getting dressed and washing his hair. While he typically worked out three days per week, he reported not having been able to do any weight exercises since his vaccination. *Id.* at 49-50. Regina Alfred, PT noted that Petitioner was right hand dominant. Petitioner's pain was 8/10 at worst and 3/10 at the present, and he tested positive for Hawkins, Neer, Full Can and Empty Can signs. *Id.* at 49-52. Petitioner's active right shoulder ROM was limited to 90 degrees of flexion and 135 degrees of abduction (whereas his left shoulder ROM was 162 degrees and 175 degrees, respectively). External and internal rotation in Petitioner's right shoulder were also limited. *Id.* at 52. Decreased scapular strength was noted as well as visible right shoulder muscle mass difference compared to his left shoulder. *Id.* at 55.

5

- Petitioner attended physical therapy on September 22 and 25, 2017. Ex. 2 at 105, 123. Sharp pains at ends of ROM were noted. *Id.* at 112, 138.

- On September 27, 2017, Petitioner discussed his x-ray results with Dr. Wantland, who advised Petitioner that his x-ray showed mild arthropathy of the acromioclavicular joint. Dr. Wantland advised Petitioner to share this result with physical therapy. Ex. 16 at 81.

- Petitioner attended physical therapy on October 4, 6, 18, 23, 25, 27, and 30, 2017. Ex. 2 at 160-272. Petitioner made progress with his active ROM and had some relief but continued to have disrupted sleep and difficulty with lifting motions. *Id.* at 272, 294.

- Petitioner sustained a fall and knee laceration during a trail run on October 31, 2017. He ran over 6 miles after his fall then presented to the Emergency Department for sutures and x-rays. Ex. 6 at 9-36. The record does not mention right arm or shoulder issues. *See id.*

- Petitioner followed-up with Dr. Wantland on November 6, 2017 for his right arm pain and his knee injury. Ex. 16 at 68. Petitioner reported that his right shoulder range of motion was improving with physical therapy but was "still not back to normal." Ex. 16 at 88. His right shoulder pain woke him up 2 – 4 times per night, and he had "maximal tenderness" at his biceps tendon. *Id.* Pain was worsened by pouring coffee and picking up his toddler. *Id.* On examination, Dr. Wantland noted limited flexion and abduction of Petitioner's right shoulder (120 degrees and 145 degrees, respectively), tenderness to palpation at the right biceps tendon, and pain with flexion, abduction, and internal rotation. *Id.* at 90. Dr. Wantland ordered a right shoulder MRI for right shoulder tendinitis and chronic shoulder pain; she also referred Petitioner to orthopedic surgery. *Id.* at 91.

- Petitioner attended physical therapy on November 6, 8, and 13, 2017. Ex. 2 at 316-364. Petitioner reported "doing well" and having "minimal to no pain" after not picking up his toddler for a few days. *Id.* at 364.

- On November 15, 2017, Petitioner presented for removal of the sutures in his right knee and discussion of his right shoulder MRI. He also reported significant improvement for his right shoulder tendinitis during a recent work trip "since he didn't have to lift his toddler throughout the day." His shoulder pain and ROM were improving. Ex. 16 at 100. Petitioner's MRI showed infraspinatus tendinopathy, muscular edema, and adjacent humeral head

6

marrow edema. Supraspinatus tendinopathy was present to a lesser extent. The MRI also showed mild acromioclavicular joint arthritis with bony overgrowth and edema. There was no rotator cuff tear. *Id.* at 102.

- On November 29, 2017, Petitioner presented to Dr. Scott McClure, an orthopedist, for right shoulder pain. Petitioner reported that his pain began the morning after he received a Tdap injection in his right shoulder. Ex. 3 at 11. Petitioner described pain as relatively minimal at rest but intermittent and stabbing when reaching and moving. *Id.* Dr. McClure found 160 degrees of flexion and 40 degrees of external rotation. *Id.* at 13. Petitioner had "well preserved strength" and "good strength in wrist and hand." *Id.* Dr. McClure assessed Petitioner with adhesive capsulitis and recommended home exercised and physical therapy focusing on "aggressive stretching." He also offered an injection which Petitioner declined. *Id.* at 14. Dr. McClure advised Petitioner to return if his symptoms persisted. *Id.*

- Petitioner attended twelve additional physical therapy sessions and was discharged on February 12, 2018, two weeks shy of six-months post-vaccination. Ex. 2 at 408-680. Petitioner's right shoulder active ROM had improved significantly, with 148 degrees of flexion, 154 degrees of abduction, 63 degrees of external rotation, and function internal rotation. *Id.* at 680. Petitioner reported being able to go to the gym—"it [was] sore but good." *Id.* at 682. Petitioner was trial discharged to self-manage with a home exercise program; he was recommended to return if symptoms persisted or increased. *Id.* at 681. Petitioner had met most of his physical therapy goals but had not entirely met his goal for flexion >150 degrees, abduction >165 degrees, and external rotation >75 degrees. *Id.* at 684.

- There is a subsequent, nearly nine-month delay in the medical record, with the next filed record dated November 13, 2018. At this time, during an unrelated visit to Dr. Christopher Pitcock, Petitioner reported his shoulder history and asked Dr. Pitcock to examine his ROM because "he had ran out of physical therapy visits" and had "been working on this at home." Ex. 4 at 56. Petitioner reported still having discomfort in the shoulder with external and internal rotation. *Id.* On examination, Petitioner had about 10 degrees of limitation for internal and external rotation. No other shoulder issues were noted, and Dr. Pitcock gave Petitioner home exercises to address the eternal and internal rotation limitations. *Id.* at 57.

In addition to medical records, Petitioner filed an affidavit explaining the basis for his contention that the Tdap vaccine he had received in August 2017 was administered

7

in his right shoulder. Ex. 8. Petitioner stated that the PPSV23 vaccine was administered *prior* to his Tdap vaccination, and in his left shoulder. Nurse Marlow, he recalled, subsequently administered the Tdap vaccine in the opposite arm because "she said something along the lines of 'yeah, the tetanus shot hurts'" when he winced in response to the shot. *Id.* ¶3. Petitioner affirmed that Nurse Marlow applied band-aids to both shoulders following vaccination. *Id.*

Petitioner also has filed copies of electronic correspondence with several acquaintances in which he discussed his shoulder pain in the days following vaccination. Ex. 10-15. For example, three days after vaccination (August 31, 2017), Petitioner texted his friends Tim Bishop and Troy Floden about how a shot "utterly immobilized" his right shoulder. He explained that it was "an entirely avoidable thing that happens called SIRVA," and that he could not use his arm. Ex. 10. That same day, Petitioner disclosed his shoulder issue to his friend Angel Ysagguirre in an email discussing a birthday party he could not attend—"bad news – and I'm obsessing about this: I went to the doctor for a physical and etc. on Monday. They gave me a tetanus booster in my right shoulder… but now I can't raise my arm anywhere near above my head…there's a clinical term for this: SIRVA." Ex. 14 at 1.

Petitioner represents he sent a very similar emails two other friends, Amanda Pertrusich and Will Allison, also on August 31, 2017. Ex. 11 at 4; Ex. 15 at 2. Mr. Allison emailed with Petitioner about his shoulder over the next several weeks, and on September 6, 2017, Petitioner wrote, "I have seen significant improvement, but my arm is still basically costume jewelry…lifting is still out of the question." Ex. 11 at 2. Petitioner also told Mr. Allison about the US Vaccine Court and that it was "quite interesting to start looking into vaccination and their side effects." *Id.* On September 14, 2017, Petitioner wrote and email to his friend Joseph Manning about a half marathon and his shoulder. He complained that his right arm was still "costume jewelry," "useless," and that "the right side of [his] body has literally started to atrophy." Ex. 12 at 1. Records of these emails were filed as redacted exhibits.

        1.    **Situs**

I find that the records taken in their totality support Petitioner's contention that the August 28, 2017, Tdap vaccine (not the PPSV23 vaccine) was likely administered in his *right* arm. The only medical record indicating otherwise is Petitioner's initial vaccination record, which documents both the PPSV23 and Tdap vaccines administered in Petitioner's left arm. Ex. 1 at 1. By contrast, Petitioner (who sought treatment quite promptly post-vaccination) repeatedly thereafter informed treaters that this vaccine, and not the PPSV23, had been administered in his right arm.

8

Respondent's arguments to the contrary have some force but are ultimately unsuccessful. First, he maintains that although *one* vaccine was likely administered to Petitioner's right arm, "there is no reliable evidence from which this Court can reasonably conclude *which* vaccine petitioner received in his right shoulder." ECF No. 34 at 2 (emphasis added). In so contending, Respondent notes that Petitioner relies on a hearsay statement by Nurse Marlow – "yeah, the tetanus shot hurts" – when he winced from pain after receiving the second vaccine (presumably evidencing the fact that she administered it in a different arm after the first vaccine, precisely because of its capacity to cause pain). But hearsay is "generally inadmissible in a court of law because it is presumptively unreliable." *Id.* at 3, citing *United States v. Godinez,* 110 F.3d 448, 456 (7th Cir. 1997). And Petitioner's assertion that Nurse Marlow incorrectly documented his vaccination in the initial administration record raises question as to the "accuracy of an oral statement from the same person, made at the same time, similarly regarding the sites of vaccination." *Id.* at 4. Respondent also questions Nurse Marlow's knowledge and understanding of what occurred during the vaccine administration given the improper vaccine placement. *Id.*

While Respondent is of course correct *generally* about hearsay treatment, special masters are not only not bound by the Federal Rules of Evidence, but are afforded broad discretion in evaluating *all* evidence offered in support of a Vaccine Injury claim, including hearsay. *Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational). Thus, the fact that a statement offered is facially hearsay does not prevent its consideration under the Act (subject to proper weighing in light of its evidentiary reliability).

In addition, the hearsay statement is not without some verification. Medical records establish that Petitioner reported a right arm Tdap vaccination to Nurse Marlow and Dr. Wantland just three days after vaccination - and his report was not rebutted nor discounted. On the contrary, Dr. Wantland expressed concern that Petitioner had a vaccine reaction with localized inflammation due to the "high immunogenicity of Tdap vaccine." Ex. 16 at 37. I also note that an error by Nurse Marlow in correctly recording the vaccines' situses when first administered does not render her entirely mistaken, unreliable, or unknowledgeable as to other matters. And it is always understood in Program cases that medical records are not presumptively accurate or complete, even if they are entitled to some weight. *See Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021). Thus, even though Petitioner's recounting of what he recalls Nurse Marlow saying may have a hearsay quality, this only means that the weight it is given should be slightly diminished – *not* that it should receive no weight at all.

9

Second, Respondent suggests that Petitioner has cherry-picked parts of the vaccination record, ignoring evidence contrary to his situs contentions. *See* ECF No. 34 at 5. For example, Petitioner alleges that the record correctly documents his PPSV23 as administered in his left arm and that it was administered first; yet the times on the initial administration record indicate that the PPSV23 vaccine was given *second*. Ex. 1 at 1; Ex. 8 at 1. Respondent submits that "if the Court were to credit the vaccination record . . . there would be even more reason to discredit the out-of-court statement by Ms. Marlow." *Id.* At the same time, Respondent himself concedes that the overwhelming evidence indicates that Petitioner was likely vaccinated in both arms – thus offering an independent basis for giving the initial record less weight than Respondent urges. ECF No. 34 at 2. And it appears also that Nurse Marlow did not complete editing and/or entering Petitioner's vaccination information until an hour after, at 11:28am. Ex. 1 at 1.

All of the above only undermines the weight to be given to the initial vaccination record that Respondent argues contradicts Petitioner's situs contention. Records that are incomplete or inaccurate can be outweighed by later testimony, if such testimony is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90- 2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). Here, the erroneous records must be weighed against Petitioner's logical explanation of his recollection of vaccine administration, as well as his medical record report of a right arm Tdap vaccination just three days after vaccination *to the same clinic (Nurse Marlow and Dr. Wantland) at which he received the vaccination. See* Ex. 8 ¶¶3,7; Ex. 16 at 36. Petitioner also consistently provided the same history to his orthopedist and physical therapist thereafter. Ex. 2 at 49; Ex. 3 at 11. All of the above supports Petitioner's claims preponderantly – and preponderance only means "more likely than not" as opposed to establishing something to a certainty.

It is certainly true that the initial vaccine administration record contradicts Petitioner's contentions. But that record is the only one to do so, and thus lacks later corroboration – whereas the entire body of medical records following vaccination indicate administration of the Tdap vaccine in Petitioner's right arm. Even if Petitioner's allegations alone cannot fully rebut the record, they bulwark other contemporaneous evidence.

   2.   **Severity Requirement**

Respondent also disputes whether Petitioner's right shoulder pain and symptoms persisted for more than six months following vaccination. He contends that Petitioner was "successfully" discharged from physical therapy on February 12, 2018, two weeks shy of six months, then "never again sought treatment." ECF No. 34 at 5. Respondent discounts Dr. Pitcock's November 13, 2018 record indicating the continued existence of Petitioner's right shoulder limitations, arguing that this does not make up for the absence

10

of a treatment history from the ensuing nine months, and that the record is at most evidence of monitoring of a condition for possible recurrence – making it insufficient to satisfy the six-month requirement. ECF No. 30 at 7; ECF No. 34 at 5.

These arguments, however, misconstrue the relevant records supporting severity. First, the February 2018 physical therapy record notes that Petitioner was "trial discharged" to continue self-management through home exercises on his own. Ex. 2 at 681. The physical therapist specifically observed at this time that Petitioner had yet to meet his ROM goals of flexion >150 degrees, abduction >165 degrees, and external rotation >75 degrees, which appear to be his base-line ROM of his left shoulder. *Id.* at 684. At trial discharge, Petitioner only had 148 degrees of flexion, 154 degrees of abduction, 63 degrees of external rotation, and function internal rotation. *Id.* at 680. This record thus establishes that Petitioner was still experiencing limitations and residual symptoms at two weeks shy of six-months post-vaccination – *not* that he was at this time recovered.

The November 2018 record from the visit to Dr. Pitcock is also more consistent with severity than Respondent allows. That record establishes that Petitioner reported lingering discomfort to Dr. Pitcock after working on his shoulder at home, which he had been instructed to do. *See* Ex. 4 at 56. He requested that Dr. Pitcock examine his ROM, and Dr. Pitcock found about 10 degrees of limitation for internal and external rotation. Dr. Pitcock gave Petitioner home exercises to address these limitations. *Id.* at 57. Respondent entirely discounts this record as "monitoring of a condition for possible recurrence," but in fact what it shows is that Petitioner was not only still experiencing residual effects of his shoulder injury (for which he received additional home exercises from Dr. Pitcock to address the remaining ROM limitations) but that the problems he had been experiencing in the winter remained.

Overall, the considerable treatment gap (during which time Petitioner attempted self-care) underscores the extent to which Petitioner's SIRVA was likely quite mild. But there is sufficient support, if barely, in this record for the finding that Petitioner experienced limitations that lingered past February 12, 2018, and into the following months. Thus, Petitioner has made a preponderant showing – *though by mere inches* – that he experienced residual symptoms of right shoulder pain for six months post-vaccination, sufficient to meet the severity requirement.

Importantly, the fact dispute that I have resolved in Petitioner's favor also counsels against a significant pain and suffering award in this case. The evidence establishes a mild SIRVA that did not interfere in any significant way with Petitioner's ability to participate in recreational activities such as half marathons, and that could be treated by the Petitioner himself. In addition, this case did not involve surgery – meaning that a six-

figure award, or anything close to that, would not be appropriate. On the contrary, a fair pain and suffering award should be on the low end of the spectrum. Petitioner is counseled to fashion any pain and suffering demand to be *extremely* modest.

### C. Other Requirements for Entitlement

In light of the lack of additional objections and my own review of the record, I find that Petitioner has established all the requirements for a Table SIRVA claim. Specifically, the record does not reflect a history of prior right shoulder pathology that would explain Petitioner's post-vaccination injury. 42 C.F.R. § 100.3(c)(3)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. § 100.3(c)(3)(10)(iii). The shoulder pain began within forty-eight (48) hours after vaccination. 42 C.F.R. §§ 100.3(a), (c)(3)(10)(ii). The pain and reduced range of motion were limited to the vaccinated shoulder. C.F.R. § 100.3(c)(3)(10)(iv). Petitioner has not pursued a civil action or other compensation. Ex. Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### Conclusion

Based on the entire record, I find that Petitioner has established receipt of the subject vaccination in his right arm, and has satisfied the six-months severity requirement. In light of the lack of additional objections in Respondent's Rule 4(c) Report and the straightforward nature of this case, **I recommend that the parties engage in damages discussions. A scheduling order will be issued shortly for the conveyance of Petitioner's demand.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master